**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SHANNON STEPHEN,

     Petitioner,

v.                                                    Case No. 8:20-cv-727-VMC-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## ORDER

Shannon Stephen, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 13.) Stephen filed a reply. (Doc. 20.) Upon consideration, the petition is **DENIED**.

## I.   Procedural History

A state-court jury convicted Stephen of two counts of DUI manslaughter and one count of leaving the scene of a crash involving death. (Doc. 14-1, Ex. 14.) The state trial court sentenced Stephen to fifteen years' imprisonment for each DUI manslaughter count and five years' imprisonment for the leaving-the-scene count. (*Id.*, Ex. 19.) The sentences were run consecutively, for a total term of thirty-five years in prison. (*Id.*) The state appellate court affirmed the convictions and sentences but remanded for entry of a "corrected order assessing fines and costs." (*Id.*, Ex. 26.)

Stephen then sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 14-2, Exs. 32, 33, 35.) The state trial court denied Stephen's claims, and the state appellate court *per curiam* affirmed the denial of relief. (*Id.*, Ex. 36; Doc. 14-4, Exs. 40, 44.)

## II.   Facts; Trial Testimony[1]

Around 1:00 a.m. on March 26, 2006, Robert Bartlett, Sarah Gleason, and Joseph Swiech were walking home from a bar in Pasco County, Florida. The three were approximately fifteen feet "off the road." (Doc. 14-5, Ex. 58, pp. 449-50.) As they were walking home, Bartlett called a friend, Rick Scott, and asked him to pick them up. Immediately after Bartlett hung up, a truck hit Gleason and Swiech. The truck drove off with Swiech "underneath" it. (*Id.*, p. 452.) Bartlett ran toward the victims and, at approximately 1:09 a.m., called 911. Gleason and Swiech died of "blunt trauma." (*Id.*, p. 566.)

Unaware that an accident had occurred, Scott and Jim Ramsey drove to pick up Bartlett, Gleason, and Swiech. On the way there, Scott and Ramsey saw a Chevrolet pickup truck that "looked like" it had run "into a building," with "severe[] damage[]" on the "front end." (*Id.*, p. 580; Doc. 14-6, Ex. 59, p. 690.) The truck came to a stop at an intersection. A man got out of the driver's side, surveyed the damage to the front of the truck, and ran to a traffic signal box on the side of the road. As sirens

---

[1] This summary is based on the trial transcript.

approached, the man hid behind the box and appeared to make a phone call. The man got back into the truck, and Scott and Ramsey drove away.

When Scott and Ramsey arrived at the scene of the accident, Bartlett told them that a "dark color" Chevrolet pickup truck had hit the victims. (Doc. 14-5, Ex. 58, p. 586.) Scott and Ramsey "put one and one together," and they drove back to where they had seen the damaged pickup truck. (*Id.*) The truck had made its way through the intersection and was parked behind a bar. Scott and Ramsey pulled in front of the truck to block it, and Scott got out to "detain the person until [they] could get the law there and let them sort it out." (Doc. 14-6, Ex. 59, p. 696.) Scott pulled the driver out of the truck and observed that he appeared to be "very well intoxicated." (Doc. 14-5, Ex. 58, p. 596.) Both Scott and Ramsey identified the driver as the same man they had seen at the intersection—Shannon Stephen.

When the police arrived, Stephen took a blood test that showed a blood alcohol content of 0.238 to 0.240—approximately three times the legal limit. After being read his *Miranda* rights, Stephen allegedly admitted "to being the driver." (Doc. 14-6, Ex. 61, p. 1103.) This admission did not, however, appear in the report prepared by the highway patrolman to whom Stephen spoke. (*Id.*, p. 1124.) Furthermore, the lead homicide investigator never learned of Stephen's alleged admission.

Before the crash, Stephen had been drinking at a bar with two friends, James Wallace and Marvin Dalzell. Stephen drove to the bar by himself in a Chevrolet Silverado, and his friends arrived together in Wallace's car. Once they were at the bar, Stephen became intoxicated. At some point, Wallace told Stephen it was "time to go."

(*Id.*, Ex. 59, p. 725.) Although Stephen did not want to leave, he walked up to the bar and paid his tab. The three left around 12:45 a.m.

After leaving the bar, Stephen urinated on a "column" in the parking lot. (*Id.*, p. 727.) Wallace and Dalzell testified at trial that they tried to take Stephen home in Wallace's truck. At some point during this process, Stephen "look[ed] up," saw where his truck was parked, and "trotted" toward it. (*Id.*, p. 729.) Stephen got in his truck, "backed into a vehicle that was parked across the aisle," and drove out of the parking lot. (*Id.*, pp. 730-31.) At trial, a bar patron (Walter Schubart) offered a different account. He testified that he saw Wallace and Dalzell help Stephen into the *passenger* side of Stephen's truck, that either Wallace or Dalzell got into the driver's side, and that the three drove off together.

By contrast, Wallace and Dalzell testified that after Stephen left the parking lot, the two of them drove together to Wallace's house, where Dalzell had parked his van. The two chatted for a few minutes, after which Dalzell drove home in his van. Then, at 1:09 a.m., Wallace called his wife and left a voicemail. At trial, Kara Wallace testified that her husband was "letting [her] know that he was home." (*Id.*, Ex. 62, p. 1307.) At her deposition, however, she claimed that Wallace had said, "[S]omething happened, it's important that you call me back." (*Id.*, pp. 1311-12, 1318-19.)

On his way home, Dalzell saw Stephen's truck on the side of the road. The "right front of the hood was caved in," and Stephen had gotten out of the truck. (*Id.*, pp. 1030-31.) Dalzell called 911 and described the scene, but he did not identify Stephen, nor did he mention he had been with Stephen earlier that night. After calling

4

911, Dalzell reached out to Wallace to let him know that Stephen "had been involved in a wreck." (*Id.*, pp. 1032-33.) Wallace called his wife again, told her what had happened, and drove to the scene. Neither Wallace nor Dalzell spoke to the police at the scene. At trial, Wallace explained that he "didn't want to rat on [his] best friend." (*Id.*, Ex. 59, p. 737.)

A freelance photographer, Brian Farrow, testified that after hearing about the accident on a police scanner, he drove to the area where Stephen's truck had stopped. There, Farrow saw a van next to the truck. He also observed "two or three people" "arguing," "shoving[,] and pushing each other." (*Id.*, Ex. 62, pp. 1363, 1371.) Figuring that "it was a couple of drunks maybe fighting [] from the strip club," Farrow drove away and headed to where the victims had been hit. (*Id.*, pp. 1373-74.)

Two Sprint employees—Dan Jensen and Youssouf Mohamed—testified about Wallace's cell phone activity the night of the accident. Mohamed opined that, if someone had made a call from the scene of the crash on March 26, 2006, the call would "most likely" have connected with cell tower 208. (*Id.*, Ex. 60, p. 971.) By contrast, a call made from Wallace's house would "most likely" have connected with cell tower 121. (*Id.*) The two cell towers were approximately four miles apart. Cell-tower data showed that, on March 26, all of Wallace's calls between 1:09 a.m. and 1:33 a.m. connected with cell tower 121.

An accident reconstructionist testified on behalf of the State. He opined that Stephen's truck was traveling 47 miles per hour when it hit the victims, that the driver did not apply the brakes, and that the victims were off the road at the time of impact.

III.   **Standards of Review**

A.   **AEDPA**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535

U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Stephen's convictions and sentences, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B.     Ineffective Assistance of Counsel

Stephen alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide

7

range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Stephen must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Stephen must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt"). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

8

### C.     Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of

the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## IV.   Discussion[2]

### A.   Ground One

Stephen contends that trial counsel was ineffective "for failing to present an accident reconstruction expert as a defense witness at trial." (Doc. 1, p. 16.) As Stephen explains, his primary defense at trial was that his friend James Wallace was driving the truck when it hit the victims, and that Wallace and Dalzell subsequently framed him. Stephen argues that, to "properly present this theory of defense," trial counsel needed to ensure that the jury understood "the timeframes involved, the routes driven by all parties, and the cellphone data from each of the parties." (*Id.*) According to Stephen, the "only way to effectively present all of this information was through an accident reconstruction expert." (*Id.*, pp. 16-17.) Thus, Stephen contends, trial counsel's failure to present such an expert at trial amounted to ineffective assistance.

The state court denied this claim as follows:

> In his first claim, the Defendant alleges that counsel was ineffective for "failing to present an accident reconstruction expert as a defense witness at trial." According to the Defendant, the defense theory at trial was to show that another person, James Wallace, was driving the Defendant's vehicle at the time the accident occurred "and [that] the Defendant was subsequently framed by Mr. Wallace and Marvin Dalzell." The

---

[2] Respondent contends that the petition is "facially insufficient" because it was signed only by Stephen's counsel. (Doc. 13, p. 10.) This argument lacks merit. A federal habeas petition may be signed and verified "by someone acting in [the petitioner's] behalf." 28 U.S.C. § 2242. Thus, "a habeas petitioner's attorney can sign and verify the petition for the petitioner." *Lucky v. Calderon*, 86 F.3d 923, 925 (9th Cir. 1996); *see also* Brian R. Means, *Postconviction Remedies* § 9:5 (2022) ("Of course, the prisoner may sign and verify the petition himself. But the language of the statute also contemplates that counsel for the prisoner may sign and verify the petition on behalf of the prisoner.").

Defendant claims that the only way this theory of defense could be properly presented was through an accident reconstruction expert. The Defendant alleges that had an accident reconstruction expert been presented at trial, said expert would have "confirmed—through comprehensive diagrams and visuals—the accuracy of the Defendant's theory," which included:

> the time that the three men left the bar; that a witness (Walter Schubart) confirmed all three men getting in the Defendant's vehicle and that the Defendant was helped into the *passenger* side of the vehicle; the route driven by Mr. Wallace which coincided with Mr. Wallace's attempt to check on the whereabouts of his wife (Kara Wallace); the initial 'something happened, this is really important' message left by Mr. Wallace on Mrs. Wallace's cellphone was left at the exact time (1:09 a.m. on March 26, 2006) that Robert Bartlett called 911 to report that the victims had been hit; and that after the accident, Brian Farrow observed 'two or three' men involved in an altercation next to a truck (the Defendant's vehicle) and a van (Mr. Dalzell's vehicle).

The Defendant goes on to claim that an accident reconstruction expert would have also been able to present a map detailing the path driven by Mr. Wallace in the Defendant's vehicle and the path driven by Mr. Dalzell in his vehicle. He claims this expert would have also been able to explain the timing of each route—which, according to the Defendant, "would have further strengthened the Defendant's theory of defense." The Defendant contends that an accident reconstruction expert would have been able to "[tie] these pieces together," and that without such an expert's testimony, "there is no way that the Defendant's theory of defense could be properly presented to the jury." He claims that he has retained two reconstruction experts who have conducted an analysis and that if this analysis had been presented to the jury, "there is a reasonable probability that the result of the trial would have been something other than a guilty verdict."

Based on the foregoing, the State was directed to respond. In its response, the State argues that the Defendant's claim should be denied as without merit. First, the State argues that the record demonstrates that the "Defendant's theory of defense was very clearly laid out and explained to the jury," and that theory of defense, which the State argues rested on [] outlining a timeline of the events to the jury, "does not require scientific, technical, or other specialized knowledge to be understood or

11

explained." To that end, the State argues that counsel for the Defendant [] was very clear and concise during closing argument when explaining to the jury, the very same facts he now claims only an expert could explain. Finally, the State a[r]gues, that even if the Court were to find that counsel was deficient, the Defendant cannot demonstrate that he was prejudiced, because, as it argued previously, the jury had already heard the very same facts he claims this accident reconstructionist would have testified about; yet, the jury still retu[r]ned with a guilty verdict.

. . .

The State's arguments are well-taken. The Court finds that the Defendant has failed to meet the requirements of *Strickland*; specifically, as it relates to demonstrating that he was prejudiced by counsel's alleged deficient performance. *See Whitfield v. State*, 923 So. 2d 375, 384 (Fla. 2005) ("[B]ecause the *Strickland* standard requires establishment of both [the deficient performance and prejudice] prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong."). The Court's conclusion is based on the fact that the jury was in fact presented with the same evidence the Defendant now claims only an expert would have been able to present. Counsel in turn used the testimony elicited, to argue to the jury, the timeline which supported the defense theory, such that there is no reasonable probability that the outcome of the trial would have been different if an accident reconstruction expert had in fact testified. *See, e.g.*, *McLean v. State*, 14 7 So. 3d 504, 511 (Fla. 2014) (applying *Strickland* and holding that defendant failed to establish prejudice from counsel's failure to call an expert in eyewitness identification where defense counsel presented evidence, through cross-examination, and argument that witness's identification was unreliable).

A review of the record reveals that during the course of the trial, counsel for the Defendant elicited testimony from various witnesses on the very same issues he claims only an expert would have been able to present to the jury in a comprehensive manner. *See State v. Bright*, 200 So. 3d 710, 739 (Fla. 2016), *reh'g denied*, SC14-1701, 2016 WL 5885554 (Fla. Oct. 4, 2016) (finding that "[t]hrough cross-examination of various State witnesses, the jury did hear in some form the evidence that Bright now claims was never presented," such that the defendant's claim failed) (internal citations omitted). The testimony covered the very same subjects the Defendant claims this expert would have testified about, including: testimony that confirmed the time that the Defendant, Mr. Wallace, and Mr. Dalzell left the bar; testimony from Walter Schubart,

who testified that he observed all three men getting in the Defendant's vehicle and that the Defendant was not driving and was instead helped into the *passenger* side of the vehicle; and testimony from Brian Farrow who testified that he observed two or three men involved in an altercation next to a truck and a van. As to the Defendant's claim that this expert would have been able to confirm that "the initial 'something happened, this is really important' message left by Mr. Wallace on Mrs. Wallace's cellphone was left at the exact time (1:09 a.m. on March 26, 2006) that Robert Bartlett called 911 to report that the victims had been hit," the Court observes that while there was testimony, albeit somewhat reluctant, from the Wallace[s] about the timing of the first call, there was no testimony that this alleged first call from Mr. Wallace occurred at the same time Mr. Bartlett called 911 to report the accident. Regardless, contrary to the Defendant's argument, an expert was not required to "tie[] together" the aforementioned testimony. To that end, the Florida Supreme Court has observed that "[t]he *Strickland* test for ineffective assistance of counsel does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense; in many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Anderson v. State*, 220 So. 3d 1133 (Fla. 2017), *reh'g denied*, SC12-1252, 2017 WL 2264716 (Fla. May 24, 2017), and *reh'g denied*, SC12-1252, 2017 WL 2271339 (Fla. May 24, 2017). The Defendant merely speculates that in the absence of this expert, the jury was unable "to see and understand the accuracy of [his] theory." According to the Defendant, the theory during the trial, was to show that another person, James Wallace, was driving the Defendant's vehicle at the time the accident occurred "and [that] the Defendant was subsequently framed by Mr. Wallace and Marvin Dalzell." It is clear that the testimony elicited by counsel from various witnesses during the course of the trial, was elicited in an effort [to] pin down a timeline that would have supported the defense's theory that Mr. Wallace, and not the Defendant, was the one who was driving the vehicle when the accident occurred. Likewise, in eliciting the relevant testimony, counsel was able to establish a timeline to support the defense's theory that Mr. Wallace, and not the Defendant, was driving the vehicle at the time of the accident. To that end, as the State aptly points out, counsel for the Defendant was able to clearly, concisely, and comprehensively outline the timeline of events to the jury based on the testimony already elicited during the trial, even in the absence of an expert testifying during the trial. Taking into account the fact that the very testimony the Defendant claims this expert would have provided, was in fact elicited through various witnesses during the trial, the only thing this expert would have been useful in providing are the

"comprehensive diagrams and visuals" the Defendant mentions; however, the Court is not persuaded that the use of a visual aid to outline the same facts the jury already heard, would have changed the outcome of the trial. *Atwater v. State*, 788 So. 2d 223, 234 (Fla. 2001) ("There is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner."). For the foregoing reasons, the Court finds that the Defendant is not entitled to relief.

(Doc. 14-4, Ex. 40, pp. 3-7 (record citations omitted).)

The state court reasonably concluded that Stephen's ineffective-assistance claim failed for lack of prejudice. To satisfy the prejudice prong under *Strickland*, Stephen must establish a "reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260-61 (11th Cir. 2012)).

Stephen failed to establish a reasonable probability that, if an accident reconstruction expert had testified at trial, the outcome would have been different. As

14

the state court explained, the jury heard the facts underlying Stephen's theory that Wallace was the driver. Specifically, the jury heard testimony that (1) Stephen and his two friends left the bar at approximately 12:45 a.m. (Doc. 14-6, Ex. 59, p. 791; *Id.*, Ex. 61, pp. 1040-43); (2) a bar patron allegedly saw Stephen and his two friends drive off in Stephen's car with Stephen in the passenger seat (*Id.*, Ex. 63, pp. 1420-23); (3) at 1:09 a.m., Wallace left his wife a voicemail saying "something happened, this is really important" (*Id.*, Ex. 59, pp. 732-34; *Id.*, Ex. 62, pp. 1311-12, 1318-19); (4) Bartlett called 911 to report the crash at approximately 1:09 a.m. (Doc. 14-5, Ex. 58, p. 566); and (5) sometime after the crash, Farrow, the freelance photographer, saw "two or three people" "arguing," "shoving[,] and pushing each other" next to Stephen's truck and a van. (Doc. 14-6, Ex. 62, pp. 1363, 1371.) Stephen's trial counsel used this evidence during closing argument to lay out his theory that Wallace was the driver. (Doc. 14-6, Ex. 62, pp. 1642-56.) At best, then, an accident reconstruction expert would have told "a more detailed version of the same story told at trial[,] provide[d] more or better examples[,] or amplifie[d] the themes presented to the jury." *Tanzi*, 772 F.3d at 660. Accordingly, the state court reasonably concluded that, because such expert testimony would have been cumulative, Stephen failed to establish prejudice.[3]

---

[3] Two months after filing his federal habeas petition, Stephen submitted a copy of a PowerPoint presentation prepared by Don Fournier, an accident reconstructionist. (Doc. 9-1.) "[F]ederal courts must limit their review under § 2254(d) to the state court's record." *Brannon v. Sec'y, Fla. Dep't of Corr.*, 813 F. App'x 376, 383 (11th Cir. 2020). Fournier's PowerPoint presentation was not part of the state-court record. Thus, the Court cannot consider it in determining whether the state court reasonably rejected Stephen's ineffective-assistance claim. Even if the presentation could be considered on federal habeas review, it would not alter the Court's conclusion that the state court reasonably applied *Strickland* in denying Stephen's ineffective-assistance claim.

Stephen challenges the state court's conclusion on several grounds. First, he claims that "in DUI manslaughter cases, the prosecution and the defense routinely present accident reconstruction experts as witnesses at trial." (Doc. 1, p. 19.) But this argument goes to deficient performance rather than prejudice. It does nothing to undermine the conclusion that there was no "reasonable probability that, but for counsel's [failure to present an accident reconstruction expert], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

Second, Stephen maintains that eliciting testimony from lay witnesses is "not the same as affirmatively presenting testimony from an expert witness who would opine that the timeline of events matches the defense's theory regarding the routes taken by Mr. Wallace and Mr. Dalzell." (Doc. 1, p. 19 (emphasis omitted).) But, as the state court correctly explained, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. Accordingly, a petitioner cannot establish prejudice by pointing to "additional expert witness[]" testimony that would have been "cumulative" of testimony presented at trial. *Parker v. Allen*, 565 F.3d 1258, 1283 (11th Cir. 2009) ("The state appellate court held that [petitioner] was not prejudiced because the additional expert witness's additional testimony was cumulative. [Petitioner's] attorneys presented witnesses during the trial who testified that [petitioner's] knife was not the murder weapon. Because [the proposed expert] testimony would have been cumulative, the district court correctly held that the state court reasonably applied *Strickland*."). Here, as explained above,

16

testimony from an accident reconstruction expert would have been cumulative of other evidence at trial.

Third, Stephen contends that the state court erroneously "focuse[d] on what defense counsel told the jury during his closing argument." (Doc. 1, p. 19.) Stephen points out that, just before closing argument, the trial court instructed the jury that "what the attorneys say is not evidence." (*Id.* (emphasis omitted).) But "[o]ne of the purposes of closing arguments is to give the attorneys the opportunity to tie together for the jury the law and the facts so that the jury can give the proper legal weight to the evidence in reaching its verdict." *Marman v. State*, 814 So. 2d 1158, 1159 (Fla. 2d DCA 2002). Indeed, closing arguments "often tie together for the jurors previously unconnected or seemingly irrelevant testimony, and highlight those phases of the evidence considered most favorable by each of the opposing parties." *Collins Fruit Co. v. Giglio*, 184 So. 2d 447, 449 (Fla. 2d DCA 1966). Here, Stephen's trial counsel used his closing argument to "tie together for the jurors" the evidence that pointed toward Wallace as the driver. *Id.* In other words, trial counsel did what Stephen contends an accident reconstruction expert should have done. (*See* Doc. 1, p. 18 (arguing that, "[a]bsent [] an [accident reconstruction] expert, all of these aspects [of the defense theory] were not tied together in a way that a jury could see and understand").)

In short, Stephen fails to establish that the state court's rejection of his ineffective-assistance claim involved an unreasonable application of *Strickland* or was

based on an unreasonable factual determination. Thus, he is not entitled to relief on Ground One.[4]

## B.    Ground Two

Stephen argues that trial counsel was ineffective for "failing to present a cellphone tower expert as a defense witness at trial." (*Id.*, p. 25.) Stephen notes that, to rebut the theory that Wallace was the driver, the State presented testimony from "cellphone tower witnesses" who "opined that Mr. Wallace's cellphone was not near the accident site but rather was near Mr. Wallace's house." (*Id.*) Stephen contends that trial counsel was ineffective because he failed to "present a cellphone tower expert to refute this testimony." (*Id.*) Stephen also notes that, although trial counsel retained two cell-tower experts prior to trial—Steven Smoot and Heather Diaz—he did not call them at trial.

Respondent contends that Stephen failed to exhaust this claim. Respondent explains that, "[i]n the operative [state] post-conviction motion, [Stephen] only generally alleged that trial counsel was ineffective for failing to present a cellphone tower expert." (Doc. 13, pp. 18-19.) According to Respondent, Stephen waited until his "amended reply" to assert, "for the very first time," that "trial counsel was

---

[4] In arguing that the state court unreasonably applied *Strickland*, Stephen cites several Florida appellate decisions. AEDPA "limits habeas relief to cases where a state-court decision contravenes or unreasonably applies 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quoting 28 U.S.C. § 2254(d)(1)). "[C]learly established Federal law" "includes only the holdings . . . of [the United States Supreme Court's] decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). Thus, the Florida appellate decisions on which Stephen relies cannot establish that the state court unreasonably applied "clearly established Federal law." *Id.*

ineffective for failing to present Smoot and Diaz as experts." (*Id.*, p. 19.) As a result, the state court "dismissed the claim in the amended reply as untimely." (*Id.*) Thus, Respondent argues that, because the state court "denied the claim on state procedural grounds," Ground Two "should be denied as procedurally defaulted."[5] (*Id.*)

The Court need not decide whether Ground Two is procedurally defaulted because the underlying ineffective-assistance claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event." (collecting cases)). Respondent is correct that the state court declined to address the merits of Stephen's claim that trial counsel was ineffective for failing to present Smoot and Diaz as experts. Nevertheless, the state court did reject on the merits Stephen's more general claim that trial counsel was ineffective for failing to call any cell-tower expert at trial. The state court denied that claim as follows:

> In his second claim, the Defendant alleges that counsel was ineffective for failing "to present a cellphone tower expert as a defense witness at trial." According to the Defendant, during his second trial [FN], the State presented cellphone tower witnesses (Dan Jensen and Youssouf Mohamed) in order to "disprove the Defendant's assertion that James Wallace was driving the vehicle at the time of the accident by giving theories regarding Mr. Wallace's location at particular times based on the cellphone tower that Mr. Wallace's cellphone was hitting." The

---

[5] The state court ruled that the allegations in the amended reply were untimely because they amounted to "a brand new claim." (Doc. 14-4, Ex. 40, p. 14.) The court noted that Stephen's "original Ground 2 claim dealt with counsel's alleged failure to retain and call [a cell-tower] expert to testify during the trial." (*Id.*, pp. 13-14.) The claim raised in the amended reply, by contrast, alleged that trial counsel "did in fact retain two experts [*i.e.*, Smoot and Diaz], and that either 'one or both' of these individuals provided favorable testimony that counsel allegedly never told [Stephen] about prior to trial." (*Id.*, p. 14.)

Defendant claims that even in light of this testimony from these two State witnesses, trial counsel failed to present a cellphone tower expert for the defense that would have refuted this testimony. He claims that if counsel would have presented a cellphone tower expert to refute the testimony from these State witnesses, there is a reasonable probability that the outcome of the trial would have been different.

> [FN] The Defendant's first trial ended in a hung jury/mistrial.

Based on the foregoing, the State was directed to respond to the Defendant's claim. In its response, the State argues the Defendant's claim is without merit, because "not one, but two cellphone tower experts, Heather Diaz and Ste[v]en Smoot," were retained by counsel. The State argues that both of these experts were in fact deposed by the State prior to trial, but that neither expert could refute the State's experts "and definitively say that Wallace was somewhere else other than where the cellphone towers placed him when he made his initial phone call and subsequent calls." The State argues that these retained experts were "only able to opine that there was a less than 50 percent chance that that scenario actually occurred."

In his reply, the Defendant alleges that the State "relies substantially on the transcript of the deposition of Steven Smoot," but that Mr. Smoot's deposition was not previously filed with the Court, and the State only filed the transcript in response to the instant motion. The Defendant relies, in part, on *Cruz v. State*, 824 So. 2d 291, 293 (Fla. 4th DCA 2002), in support of his argument that the Court cannot rely on Mr. Smoot's deposition to deny his claim (finding that "the deposition excerpt was not made part of the trial court record before being supplied in the state's response, and the trial court should not have relied upon this non-record submission to summarily deny appellant's motion").

First, the Court notes that, as the Defendant points out, it appears that Mr. Smoot's deposition was not filed as a part of the record in this case. The Court recognizes [] the import of the Defendant's argument about Mr. Smoot's deposition testimony not being made a part of the record; however, the Court is not persuaded by the Defendant's argument that the State "relie[d] substantially" on Mr. Smoot's testimony alone, in arguing that his claim should be denied, such that an evidentiary hearing is required. It merely appears as though the State summarized the relevant testimony of each witness, with no more weight or reliance being placed on one over the other. The Court would also note that contrary to

20

the Defendant's suggestion, Ms. Diaz'[s] deposition was in fact filed, February 18, 2010, and made a part of the record, as reflected in the docket. While mindful of the fact that, since Mr. Smoot's deposition was not made a part of the record, Mr. Smoot's deposition is considered a non-record submission that this Court cannot rely on to refute the Defendant's claim, *Cruz*, 824 So. 2d at 293, the Court still finds that the Defendant is not entitled to relief on this claim.

Even if this Court were to only consider Ms. Diaz's deposition testimony, her testimony standing alone is sufficient to refute the Defendant's claim that counsel for the Defendant failed to retain cellphone tower experts. The Court recognizes that neither one of these witnesses were called during the course of the trial; however, a review of Ms. Diaz'[s] deposition testimony reveals that her opinion was limited to challenging the validity of a report, referred to as the Viador report [FN], from Sprint, and that she did not provide any testimony that would have refuted the State's theory that the cellphone tower records demonstrated that Mr. Wallace was not the individual driving when the accident occurred. Simply put, her testimony did not appear helpful in this regard. This is so, because a review of Ms. Diaz'[s] deposition testimony reveals that she merely opined that the report did not contain all of the elements she expected to be present on a report such as this, and that she was unable to authenticate the data in the report, because the source of the data was not clear.

   [FN] This report contained call data information[.]

Notwithstanding the foregoing, the Court would also note that the Defendant cannot demonstrate that he was prejudiced. The record demonstrates that, through cross-examination, counsel for the Defendant was able to obtain rather significant concessions from both of the State's cellphone tower experts, Dan Jensen and Youssouf Mohamed; testimony[] that refuted the testimony the State had elicited through these very same experts in an effort to disprove the Defendant's assertion that James Wallace was driving the vehicle at the time of the accident. *See Johnson v. State*, 247 So. 3d 689, 696 (Fla. 1st DCA 2018) ("[A] defendant does not establish that his attorney performed deficiently in failing to retain a defense expert, when defense counsel 'rigorously challenged the state's expert.'") (internal citations omitted). For example, during the cross-examination of the first of the State's cellphone tower experts, Mr. Jensen, he conceded that he could not provide the exact location of a mobile phone. *Cf. Goldman v. State*, 57 So. 3d 274, 277 (Fla. 4th DCA 2011) ("Based on the cross-examination of the state's toxicologist at trial,

it appears defense counsel was not prepared to challenge the BAC results."). Counsel was also able to get Mr. Jensen to concede that the main report that the State's experts were relying on, the Viador report, was not the best tool to use for determining geographic location. The Court also notes that on re-cross examination, counsel was able again [] to get Mr. Jensen to concede on some very specific issues integral to the defense, including an instance whereby counsel asked Mr. Jensen "if the State of Florida has brought you here to testify that a particular call occurred at a particular time at a particular direction, given the records that we have here today that have been entered into evidence and that we've all seen today, are you able to testify to that location," to which Mr. Jens[e]n responded, "I cannot testify to the exact location of a handset from these records." Mr. Jensen went on to concede that he also could not testify as to the direction either, not even a general direction. Furthermore, during the cross-examination of the second expert, Mr. Mohamed[,] Mr. Mohamed also conceded that the call data report that he reviewed in preparation for testifying in this case, was not the best record to use for geographically locating someone. Mr. Mohamed also acknowledged that utilizing GPS is the best way to locate a particular mobile phone, but indicated that GPS was not as widespread in its use during the relevant time, 2006. Because of the testimony counsel elicited from these State experts during cross-examination, he was able to emphasize the deficiencies in their testimony, reiterating that the records these experts relied on, were not optimal for determining geographic location, and were not 100% accurate.

The Court finds that counsel was able to obtain concessions from these experts that demonstrated the same thing the Defendant claims an expert would have been able to do had he or she been called during the course of the trial; namely, refuting testimony from State witnesses that was meant to disprove the Defendant's assertion that James Wallace was driving the vehicle at the time of the accident. The Defendant has failed to demonstrate that counsel was ineffective. *See Johnson v. State*, 247 So. 3d at 689 ("Defense counsel's failure to retain an expert who could testify about the range of cellphone towers was not deficient performance and, thus, was not ineffective assistance in attempted murder prosecution, where during counsel's cross-examination of the State's expert defense, counsel elicited testimony that if the cellphone tower near an individual gets too busy that a different tower will pick up the call, that an individual's cellphone records would then indicate that he was near the second tower, even though he was not, and defense counsel emphasized this testimony during closing arguments, reiterating that the cellphone tower evidence did not actually establish defendant's location at the time

of the offenses."). For the foregoing reasons, the Court finds that the Defendant is not entitled to relief.

(Doc. 14-4, Ex. 40, pp. 7-10 (record citations omitted).)

Even under *de novo* review, Stephen's ineffective-assistance claim fails for lack of prejudice. To show prejudice, Stephen must establish a "reasonable probability that, but for counsel's [failure to present a cell-tower expert], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. Stephen attempts to meet the prejudice prong by arguing that trial counsel "had at his disposal the testimony of two experts"— Diaz and Smoot—"who would have refuted the State's cellphone tower testimony." (Doc. 1, p. 27.) This attempt to show prejudice falls short.

Diaz's deposition testimony reveals that she would not have "refute[d]" the State's cell-tower evidence. (*Id.*) She testified that she could not "authenticate" the data in Sprint's cell-tower report. (Doc. 14-3, Ex. 37, pp. 140-41.) Thus, according to Diaz, the report "could have" been "manually fabricated." (*Id.*, p. 141.) Diaz subsequently clarified, however, that she had no evidence the report was actually fabricated. (*Id.*, p. 159.) To be sure, Diaz also testified that (1) a cellphone will connect to the cell tower with the "strongest signal," which may not be the "closest" one; and (2) the cell-tower report did not "accurately reflect the location of the cell phone device," instead providing only the "general location" of the phone. (*Id.*, pp. 121-22, 158.) At trial, however, one of the State's cell-tower experts conceded that (1) cell-tower data could not provide "an exact location of" a cellphone, (2) cell-tower records were "not the best" tool for determining "geographic location," and (3) he could not testify about the

"general direction" from which a call was made. (Doc. 14-6, Ex. 60, pp. 917, 929, 934-37.) Accordingly, Diaz's testimony was either unhelpful to the defense or cumulative of concessions trial counsel was able to obtain from the State's experts.

The same is true of Smoot's testimony. At his deposition, Smoot testified that he initially "speculated" that Wallace's 1:09 a.m. call to his wife "may have [originated] in a location that was not obvious, and probably closer to the site of the accident." (Doc. 14-3, Ex. 37, p. 191.) Smoot began with a "fairly high probability" that this was the case, but after reviewing additional information, he "reduced . . . that probability to below fifty percent." (*Id.*, p. 225.) Smoot clarified that he did not "know" "[e]xactly where" the probability fell, just that it was "less than fifty percent." (*Id.*, pp. 225-27.) Later in the deposition, the prosecutor asked Smoot to describe the "ultimate opinion [he would] be making in this case." (*Id.*, p. 231.) Smoot responded: "I have not formed that opinion yet. I have reduced probabilities where I understand about the circumstances in terms of whether or not that call could have been placed other than where it generally was expected to be. I have not gone to the point of making that an opinion I'm ready to support and describing it." (*Id.*, p. 232.) There is no "reasonable probability" that, had the jury heard Smoot's equivocal testimony, "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.[6]

---

[6] Like Diaz, Smoot testified that (1) "[i]t's not always true that" that a cellphone will connect to the closest cell tower, and (2) cell-tower data are "very inaccurate" and provide only a "general location." (Doc. 14-3, Ex. 37, pp. 239, 247.) For the reasons explained above, such testimony would have been cumulative of concessions trial counsel obtained from the State's cell-tower experts.

In sum, Stephen has failed to establish that he was prejudiced by counsel's failure to present Diaz, Smoot, or any other cell-tower expert at trial. *See, e.g.*, *Taylor v. Sec'y, Fla. Dep't of Corr.*, No. 3:12-cv-444-BJD-MCR, 2021 WL 2003122, at *12 (M.D. Fla. May 19, 2021) (holding that petitioner "failed to show the required prejudice under *Strickland* by any failure to call an expert witness" because "defense counsel effectively cross examined the state's expert"). Thus, Stephen is not entitled to relief on Ground Two.[7]

## C.    Ground Three

Stephen argues that trial counsel rendered ineffective assistance by "failing to present a toxicologist as a defense witness at trial." (Doc. 1, p. 29.) Stephen notes that his truck "was driven for approximately one mile after the accident." (*Id.*) During this time, liquid leaked from the truck onto the pavement, "leaving visual evidence of the path that the vehicle took following the accident." (*Id.*) The "liquid path [was] in a straight line." (*Id.*) Stephen maintains that, given his "intoxication level, there is no way that he could have driven the vehicle in a straight path." (*Id.*) This allegedly bolsters Stephen's theory that "James Wallace was driving [] Stephen's vehicle at the time of the accident." (*Id.*) According to Stephen, a toxicologist could have explained to the jury that he was too intoxicated to drive his truck in a straight line. Thus, Stephen argues, trial counsel's failure to call a toxicologist amounted to ineffective assistance.

---

[7] Respondent contends that the Court should not consider Smoot's deposition testimony because it was "not properly before the state court." (Doc. 13, p. 21.) The Court need not resolve this issue because, even if Smoot's testimony is considered, the ineffective-assistance claim fails.

The state court denied this claim:

In his third claim, the Defendant alleges that counsel was ineffective for "failing to present a toxicologist as a defense witness during the trial." According to the Defendant, his vehicle was driven for approximately one mile following the accident. He claims that liquid leaked from the vehicle onto the pavement, "leaving visual evidence of the path that the vehicle took," and that "[t]he liquid path is in a straight line." He claims that given the level of the Defendant's intoxication on that night, "there is no way that he could have driven the vehicle in a straight path." He goes on to claim that this evidence "further proves that James Wallace was driving the Defendant's vehicle at the time of the accident and then drove the vehicle after the accident to the intersection where he was picked up by Marvin Dalzell in Mr. Dalzell's van." According to the Defendant, a toxicologist would have been able to explain to the jury that given the Defendant's level of intoxication that night, he "could *not* have driven the vehicle in a straight line following the accident." (emphasis in original). To that end, he claims that had counsel presented a toxicologist, there is a reasonable probability that the outcome of the trial would have been different.

Based on the foregoing, the State was directed to respond to the Defendant's claim. In its response, the State argues that the Defendant's claim is without merit, because counsel thoroughly questioned a State witness, Corporal Michael Styers, "about the path of the liquid [from] [the] Defendant's vehicle." Corporal Styers indicated at one point, that the path of the liquid "was straight in that 'it was within the southbound lane.'" The State goes on to argue that counsel even argued, during closing argument, that evidence of the fact this liquid leaked in a straight line supported the defense theory that Mr. Wallace was actually the individual driving the vehicle when the accident occurred. The State also points out that the State objected when counsel for the Defendant made this argument, and counsel responded that the jury could use their common sense, that they have observed individuals under the influence, and it was not something that required expert testimony. To that end, argues the State, an expert is not required to understand the defense's argument that evidence that the fluid leaked in a straight line demonstrates that another individual, presumably, more sober, was driving the vehicle. Furthermore, the State argues that the Defendant's argument is not only speculative, but i[s] also based on a series of fault[y] assumptions, including the presumption that "the only possible explanation for [the] straight line [of leaked liquid] is that the vehicle drove in a straight [line] which would have required a driver who was

capable of driving in a straight line." The State also argues that the Defendant's argument that "this straight line of fluid supports his theory that [Mr.] Wallace was actually driving the vehicle cannot be reconciled with Valerie Herbert's testimony," that "she was so concerned by [the] Defendant's driving pattern that she called 911." The State argues that Ms. Herbert's testimony contradicts the Defendant's allegation that this same driver, "was then able to drive in a straight line just a few minutes after it collided with the victims." The State characterizes such an argument as "illogical and unreasonable." Finally, the State points this Court's attention to the fact that the Defendant was "very involved in his trial." The State argues that the Court routinely checked in with the Defendant[] regarding his representation and understanding of the proceedings, and during one colloquy, the Defendant acknowledged that he was satisfied with the representation of counsel, after counsel advised the Court that the defense was not calling any other witnesses, other than potentially the Defendant. The State argues that the Defendant's claims concerning these witnesses [are] nothing more than his attempt to go behind sworn representations.

In his reply, the Defendant contends that he relies on the same arguments he raised in his reply [], and contends that he is entitled to an evidentiary hearing. As a final matter, the Defendant argues that the State's contention that the Defendant cannot go behind his sworn representations concerning his satisfaction with counsel, is not an argument that insulates counsel from postconviction review of his performance. He relies on *Evans v. State*, 737 So. 2d 1167, 1168 (Fla. 2d DCA 1999) in support of this contention.

The Court finds that the Defendant is not entitled to relief on this claim. As the State points out, by way of the testimony from defense witness, Corporal Styers, the jury heard, in some form, the same evidence the Defendant now claims, only a toxicologist, could present to the jury. It is clear that counsel elicited testimony that was in support of the very claim that the Defendant now alleges an expert toxicologist would have testified about during the trial. And, as the State also points out, counsel for the Defendant relied on this testimony in arguing, during closing arguments, that the straight line of leaked liquid, supported the defense theory that Mr. Wallace was actually the individual driving the vehicle when the accident occurred. *See Hernandez v. State*, 180 So. 3d 978, 992 (Fla. 2015) (finding that "[t]rial counsel's failure to call independent medical expert to testify that victim's neck was not broken by twisting motions, as witness had testified defendant had reported having done, did [not] constitute deficient performance, and thus was not ineffective

assistance of counsel in capital murder trial, where jury heard testimony and argument that would allow them to" reach the same conclusions even in the absence of this expert testimony). Additionally, as the State points out, what the Defendant proposes this expert would have been able to testify to and about, is entirely speculative and based on rather attenuated assertions. Furthermore, as the State also points out, the Defendant's theory [that] someone sober or less intoxicated than the Defendant had to be driving given the evidence of a straight line of leaked liquid is contradicted by other testimony given during the trial from Valerie Herbert. Ms. Herbert testified about the erratic manner in which this driver was driving, so much so that she called 911 to report the driver's behavior. Regardless of whether the driver was the Defendant, or as he claims, Mr. Wallace, Ms. Herbert's testimony about the manner in which this individual was driving, does not reconcile with the Defendant's speculative claim about how the leaked liquid ended up in a straight line. For the foregoing reasons, the Court finds that the Defendant is not entitled to relief.

(Doc. 14-4, Ex. 40, pp. 10-13 (record citations omitted).)

The state court reasonably rejected Stephen's ineffective-assistance claim. As an initial matter, Stephen did not present the state court with any evidence that a toxicologist would have testified as he suggests. Thus, the state court correctly concluded that it was "entirely speculative" that a toxicologist would have opined that Stephen was too intoxicated to drive in a straight line. (*Id.*, p. 12.) Such speculation is insufficient to establish prejudice under *Strickland. See Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (holding that state court reasonably rejected *Strickland* claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" the way petitioner wanted).

Even if a toxicologist would have testified as Stephen suggests, he still would not be entitled to relief. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is

merely cumulative." *Van Poyck*, 290 F.3d at 1324 n.7. As the state court explained, a toxicologist's testimony would have been cumulative of other evidence at trial. That evidence showed that (1) Stephen's blood alcohol content after the crash was three times the legal limit, (2) Stephen appeared to be "very well intoxicated" when Scott pulled him out of the truck, and (3) Stephen's truck left a straight, mile-long fluid trail between the scene of the accident and the area "where the vehicle came to final rest." (Doc. 14-5, Ex. 58, p. 596; Doc. 14-6, Ex. 59, p. 664; Doc. 14-6, Ex. 62, pp. 1267-72.) During closing argument, Stephen's trial counsel pointed out that the State "want[ed] [the jury] to believe two things. He was sloshed, impaired, but he was doing things that people that have that much alcohol in their system cannot do." (Doc. 14-6, Ex. 63, p. 1610.) Moreover, to support his theory that Wallace was the driver, trial counsel noted the "critical point" that the truck left "a straight fluid line" after the accident. (*Id.*, p. 1608.) Thus, the state court reasonably concluded that, even without a toxicologist, trial counsel was able to effectively argue that the straight fluid trail pointed to Wallace as the driver. For that reason, there was no basis to conclude that Stephen was prejudiced by the failure to present a toxicologist at trial.

Stephen faults the state court for relying on Valerie Herbert's testimony that, shortly before the accident, she called 911 to report that Stephen's truck was driving erratically. There was nothing improper about the state court's reliance on this testimony. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. To be sure, the fluid trail suggested that Stephen's truck was driving straight. And a toxicologist might have

testified that Stephen was too intoxicated to drive in a straight line. But any such expert testimony would have been undercut by Herbert's testimony that the truck was driving erratically just before the accident. Thus, Herbert's testimony supported the conclusion that there was no "reasonable probability that, but for counsel's [failure to present a toxicologist], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

In sum, Stephen fails to establish that the state court's rejection of his ineffective-assistance claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. Thus, he is not entitled to relief on Ground Three.

### D.   Ground Four

Stephen contends that trial counsel was ineffective for failing to admit into evidence a bar receipt from the night of the crash. According to Stephen, the bar receipt would have shown the time he left the bar, thus confirming his "timeline" and supporting his "theory that James Wallace was driving [] Stephen's vehicle at the time of the accident." (Doc. 1, p. 32.) Stephen notes that, during its deliberations, the jury asked, "[W]hat was the time registered on the bar tab[?]" (*Id.*) Because trial counsel did not introduce the bar receipt, the trial court "was required to answer the jury's question by saying 'all of the evidence that has been entered in this trial is back with you.'" (*Id.*) Stephen also notes that, during the first trial (which ended in a hung jury), trial counsel was able to introduce the bar receipt.

The state court denied this claim as follows:

> In his fourth claim, the Defendant alleges that counsel was ineffective for failing "to admit the bar receipt into evidence." He claims this bar receipt would have shown the time that the Defendant left the bar and would

30

have confirmed the Defendant's timeline and theory that Mr. Wallace was driving the vehicle at the time of the accident. Next, he points this Court's attention to the fact that counsel properly admitted the bar receipt into evidence during the first trial; however, according to the Defendant, counsel failed to do so during the second trial. In bringing this information to the Court's attention, he suggests that counsel's failure to admit this bar receipt during the second trial was due to counsel's failure to "subpoena a witness who could properly authenticate the receipt."

First, the Court notes that it has been unable to locate the portion of the record that supports the Defendant's claim that counsel was able to admit the bar receipt during his first trial. Regardless, the Defendant's claim that counsel was ineffective for failing to admit this receipt into evidence during his second trial is without merit. A review of the record reveals that during the Defendant's second trial, counsel for the Defendant attempted to admit the bar receipt[] during the cross-examination of James Wallace. The State objected to defense counsel attempting to do so, and argued that the defense failed to lay the proper predicate to support the contention that Mr. Wallace could authenticate the bar receipt as the one the Defendant had on the night the accident occurred. The State also argued that there was no way to determine whether the time stamp on the bar receipt was in fact accurate. In response, counsel for the Defendant argued that Mr. Wallace could in fact properly authenticate the bar receipt because "he was right there when [the Defendant] paid his tab." The Court ruled that *if* defense counsel could lay the proper predicate to establish that Mr. Wallace saw the Defendant's bill and was able to recognize it in court, then there may be predicate to allow defense counsel to question Mr. Wallace about the bar receipt. Defense counsel advised the Court that he would ask Mr. Wallace whether he recognized the receipt and if Mr. Wallace indicated that he recognized it, counsel would move forward with attempting to admit it into evidence; however, if Mr. Wallace indicated that he did not recognize it, counsel would "stop there." Thereafter, the following exchange took place between defense counsel and Mr. Wallace:

> [DEFENSE COUNSEL]: Mr. Wallace, I'm showing you what's been previously marked Defense P, as in "Paul" for identification. I'm going to ask you [to] take a look at that and see if you recognize it?

> MR. WALLACE: I don't remember it.

> [DEFENSE COUNSEL]: Do you recognize it?

MR. WALLACE: It's a receipt.

[DEFENSE COUNSEL]: And did you read it?

MR. WALLACE: Yes.

[DEFENSE COUNSEL]: And do you recognize it?

MR. WALLACE: It's more than I remember it being.

[DEFENSE COUNSEL]: My question was, do you recognize it? Nothing about an amount. Do you recognize that amount?

[PROSECUTOR]: Objection. Asked and answered.

[DEFENSE COUNSEL]: He hasn't answered it[,] Judge.

THE COURT: Overruled.

MR. WALLACE: No, I don't remember seeing that. I remember seeing him sign something.

Since Mr. Wallace testified that he did not recognize the bar receipt, counsel for the Defendant moved on to a different line of questioning. Nevertheless, it is clear that counsel attempted to lay the proper predicate in order to get this bar receipt admitted into evidence; however, as the record clearly shows, he was unable to do so, because Mr. Wallace testified that he did not recognize the bar receipt. This does not amount to ineffective assistance of counsel. Counsel attempted to lay the proper predicate to enter the bar receipt into evidence, but failed to do so because Mr. Wallace was unable to properly authenticate the bar receipt. *Teffeteller v. Dugger*, 734 So. 2d 1009, 1020 (Fla. 1999) ("Counsel cannot be deemed ineffective for failing to prevail on a meritless issue.").

The Court recognizes that the Defendant's claim is premised, in part, on his allegation that counsel was ineffective for failing to "subpoena a witness who could properly authenticate the receipt;" however, the Court notes that the Defendant has failed to identify exactly what witness counsel should have subpoenaed in order to properly authenticate this receipt. Regardless, even assuming *arguendo* that the Court was to find that counsel was ineffective for failing to admit the bar receipt because of

his failure to subpoena a witness that could properly authenticate the receipt, the Defendant would still not be entitled to relief on this claim because he cannot demonstrate that he was prejudiced by this failure. The Defendant acknowledges that the purpose of the bar receipt he complains of, was to show the time that he left the bar, which would have confirmed the Defendant's timeline and theory that Mr. Wallace was driving the vehicle at the time of the accident. However, the record reflects that counsel for the Defendant was able to elicit testimony from other witnesses concerning the time that the Defendant left the bar. Specifically, during the cross-examination of Mr. Wallace, counsel for the Defendant asked Mr. Wallace whether they left the bar "around quarter to 1:00 or so," to which Mr. Wallace responded "Yes." Counsel went on to question Mr. Wallace about the events that occurred from the time he, the Defendant, and another friend (Marvin Dalzell) left the bar, about the timeframe associated with certain incoming and outgoing phone calls with Mr. Wallace's cell phone, as well as about the time that he claimed he found out about the accident. Additionally, during the cross-examination and recross examination of another witness, Mr. Dalzell, counsel asked questions of this witness to establish the exact time that he (Mr. Dalzell), Mr. Wallace, and the Defendant left the bar. It is clear that counsel posed these questions to both of these witnesses in an effort [to] pin down a timeline that would have supported the defense's theory that Mr. Wallace, and not the Defendant, was the one who was driving the vehicle when the accident occurred. Indeed, by eliciting testimony from witnesses concerning the time that the Defendant and his friends left the bar, counsel was able to do exactly what the Defendant claims this bar receipt would have done, which is to establish a timeline to support the defense's theory that Mr. Wallace, and not the Defendant, was driving the vehicle at the time of the accident. The Court would also note that even in the absence of this bar receipt, counsel for the Defendant was still able to focus, in detail, on the timeline of events leading up to the accident during his closing argument, and in doing so, he argued, in part, the following:

> So this whole case comes down to pretty much one thing. At 1:09 both the State and the Defense agree that that is the time these two young people lost their lives . . . . [b]ut coincidentally Mr. Wallace is calling his wife at 1:09. That's just a coincidence. That's what the State wants you to believe. That's just a coincidence [t]hat he's calling his wife at 1:09. And what was Mr. Wallace's testimony regarding that 1:09 call, just letting her know I was home.

(. . .)

At 1:09 is the time of impact. Jim Wallace calls [his wife] Kara to tell her something happened, you need to call me back.

(. . .)

At 1:09 Jim Wallace calls Kara and leaves a voicemail, we can see that on their records. Kara something happened, you have to call me right back. It's important, Kara Wallace's testimony.

The Court would also note that counsel attempted to persuade the jury that Mr. Wallace's phone records also support the defense's theory that Mr. Wallace was the driver of the vehicle by arguing that Mr. Wallace's phone records reveal that he made an outgoing call to his friend, Mr. Dalzell, at the same time two witnesses reported seeing an individual at the scene of the accident, on his cell phone and hiding behind a utility box. Indeed, the record reflects that counsel dedicated a good portion of his closing argument outlining the sequence of events, and the associated times, leading up to the accident, in an effort to support the defense's theory that Mr. Wallace, and not the Defendant, was the person driving the car when the accident occurred. The Court therefore finds that the Defendant cannot establish that he was prejudiced by his omission. Furthermore, the Court finds that the admission of this bar receipt, so that someone could testify about the time stamp on it to establish the time the Defendant left the bar, was also cumulative of the aforementioned testimony from Mr. Wallace and Mr. Dalzell. Merely corroborating or slightly expanding testimony qualifies as cumulative testimony. *See Lynch v. State*, 2 So. 3d 47, 71 (Fla. 2008) (quoting *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007)). Counsel cannot be deemed ineffective for failing to present cumulative evidence. *See Solorzano v. State*, 25 So. 3d 19 (Fla. 2d DCA 2009).

(Doc. 14-2, Ex. 36, pp. 5-9 (record citations omitted).)

The state court reasonably rejected Stephen's ineffective-assistance claim. As an initial matter, in his Rule 3.850 motion, Stephen did not allege the time reflected on the bar receipt. (*Id.*, Ex. 35.) Without that information, it is unclear how Stephen could

have established that the failure to admit the receipt prejudiced his ability to present a timeline. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) (noting that "speculation" is "insufficient to carry the burden of a habeas corpus petitioner"). Stephen attempts to remedy this evidentiary gap by submitting a copy of the receipt to this Court. (Doc. 20-1.) But AEDPA limits this Court's review of state-court adjudications "to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). As a result, the Court cannot consider the bar receipt in evaluating whether the state court reasonably rejected Stephen's claim.

In any event, the state court reasonably concluded that, based on the record before it, Stephen failed to show prejudice. As noted above, a petitioner cannot establish prejudice under *Strickland* "by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck*, 290 F.3d at 1324 n.7. The state court reasonably concluded that the bar receipt would have been cumulative of other evidence at trial concerning the time Stephen and his friends left the bar. That evidence included (1) Wallace's testimony that the three left the bar at approximately 12:45 a.m. (Doc. 14-6, Ex. 59, p. 797); (2) Dalzell's testimony that the three "probably" left the bar at 12:45 a.m. (*Id.*, Ex. 61, p. 1073); and (3) the bar patron's testimony that he saw Stephen and his friends in the parking lot at approximately 1:00 a.m. (*Id.*, Ex. 63, pp. 1420-25, 1432-33, 1443, 1446.) Notably, trial counsel drew on this evidence during closing argument to present his timeline to the jury. (*Id.*, Ex. 64, p. 1646 ("But he [the bar patron] testified that he was inside the bar and the first thing he got was the voicemail, that's at 12:45, that's what they're saying the time that they

left. Jim [Wallace] says that, all of them say [] 12:45.".) Stephen "cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial." *Morgan v. United States*, 785 F. App'x 682, 686 (11th Cir. 2019).

Because the state court reasonably concluded that Stephen failed to establish prejudice, the Court need not address trial counsel's performance. *See Bishop v. Warden, GDCP*, 726 F.3d 1243, 1255 (11th Cir. 2013) ("We need not address counsel's performance, because, even if we were to assume that counsel were ineffective in failing to call the officers, the state court's prejudice determination was not an unreasonable one."). The rejection of Stephen's ineffective-assistance claim did not involve an unreasonable application of *Strickland*, nor was it based on an unreasonable factual determination. Accordingly, Stephen is not entitled to relief on Ground Four.

### E.    Ground Five

Stephen argues that trial counsel "rendered ineffective assistance by failing to obtain a protective order for witness Kara Wallace's cellphone texts." (Doc. 1, p. 36.) Stephen explains that trial counsel moved for a mistrial because Kara Wallace was using her cellphone while she was testifying. The trial court denied the motion, explaining that "defense counsel had to provide the trial court with proof that Mrs. Wallace was, in fact, discussing the substance of [her] testimony" while using her cellphone. (*Id.*) After the trial, the court indicated that it would sign a "protective order" for the cellphone if Stephen's counsel submitted one. (*Id.*) According to Stephen, however, trial counsel "failed to follow through and get a signed protective

order." (*Id.*) Stephen maintains that, had trial counsel obtained the protective order, he "would have been able to prove that Mrs. Wallace did, in fact, violate the rule of sequestration by discussing the substance of her testimony in [] texts with her husband." (*Id.*, p. 37.)

The state court denied this claim as follows:

> In his fifth claim, the Defendant alleges that counsel was ineffective for "failing to obtain a protective order for witness Kara Wallace's cell phone texts" The Defendant claims that during the trial, counsel for the Defendant moved for a mistrial due to Ms. Wallace violating the rule of sequestration by texting her husband, James Wallace, while she was on the stand testifying. The Defendant claims Ms. Wallace did this in the presence of the jury but that the Court denied the motion for a mistrial and advised counsel for the Defendant that he "had to provide the Court with proof that Mrs. Wallace was, in fact, discussing the substance of testimony when she was texting with Mr. Wallace." He goes on to claim that thereafter, on August 3, 2010, the Court held a hearing whereby defense counsel was advised by this Court that if counsel "provided the Court with a protective order directed towards Mrs. Wallace's cell phone, the Court would sign the order (so that the text messages would be preserved, thereby allowing defense counsel to obtain the text messages from Mrs. Wallace's cell phone carrier)." However, according to the Defendant, counsel failed to obtain a signed protective order from the Court. He claims that this amounts to ineffective assistance of counsel and that but-for this failure, "counsel would have been able to prove that Mrs. Wallace did, in fact, violate the rule of sequestration by discussing the substance of her testimony in her texts with her husband" and "the Court would have granted a post-trial motion for a new trial based on new evidence."

> The record reflects that on August 3, 2010, counsel for the Defendant filed a "Motion for Protective Order," requesting that the Court issue a protective order to AT&T Wireless to preserve the cell phone records of Mrs. Wallace. On that same date, as the Defendant points out, a hearing was held concerning the aforementioned motion, whereby counsel for the Defendant advised the Court that he was seeking permission from the Court to preserve Mrs. Wallace's cell phone records. Counsel advised the Court that he mistitled the motion and that he would amend the title (titling it as an "order" as opposed to a "motion") and resubmit it to the

Court for signature. The Defendant claims that counsel never provided the Court with an amended order and the Court would agree that there is no indication in the record whether counsel ever provided the Court with an amended order; however, the Court finds that even in the absence of this order, this claim is without merit.

The Defendant claims that if this order had been signed and issued to the cell phone carrier, "counsel would have been able to prove that Mrs. Wallace did, in fact, violate the rule of sequestration by discussing the substance of her testimony in her texts with her husband." However, this is mere conjecture. The Defendant's claim is based on nothing more than what he speculates would have occurred had counsel followed up with obtaining a signed order from the Court. The Defendant has no way of knowing exactly what would have been revealed from Mrs. Wallace's cell phone records. He merely speculates that there would have been evidence of Mrs. Wallace actually texting her husband, James Wallace. Even if the order revealed that Mrs. Wallace was texting her husband, the Defendant continues to speculate that said texting, if in fact evidence of texting would have been discovered, actually concerned the substance of her testimony. Similarly, he speculates that the Court would have granted a new trial. Speculation cannot form the basis for postconviction relief. *See Johnson v. State*, 921 So. 2d 490, 503-04 (Fla. 2005); *Solorzano*, 25 So. 3d at 23.

(Doc. 14-2, Ex. 36, pp. 9-11 (record citations omitted).)

The state court reasonably rejected Stephen's ineffective-assistance claim for lack of prejudice. Stephen did not present the state court with Kara Wallace's cellphone records. Nor did he allege what those records showed. Instead, as the state court explained, Stephen merely speculated that the records would "prove that Mrs. Wallace did, in fact, violate the rule of sequestration by discussing the substance of her testimony in her texts with her husband." (*Id.*, Ex. 35, p. 13.) But "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985); *see also Johnson*, 256 F.3d at 1187 ("[Petitioner] offers only speculation

that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner."). Accordingly, Stephen failed to establish "a reasonable probability that, but for counsel's [failure to obtain the protective order], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The state court's rejection of this ineffective-assistance claim did not involve an unreasonable application of *Strickland*, nor was it based on an unreasonable factual determination. Thus, Stephen is not entitled to relief on Ground Five.

### F.    Ground Six

Stephen contends that the trial court violated his due process rights by denying his motion to suppress "his truck and all evidence obtained from the truck." (Doc. 1, p. 38.) In his motion to suppress, Stephen contended that the truck was "towed from the scene" by a private company and temporarily parked at that company's lot. (*Id.*) While the truck was parked at the lot, "several credit cards" and a portable GPS device were "removed" from the vehicle. (*Id.*) Following this "tampering," police collected evidence from the truck, including the "crash data retrieval system." (*Id.*, pp. 38-39.) Stephen maintained that, as a result of the "tampering," the "chain of evidence" was "taint[ed]," "call[ing] into question the legitimacy of any evidence obtained from" the truck. (*Id.*, p. 39.) Accordingly, Stephen sought to suppress "any evidence obtained" from the truck "after the tainting and tampering." (*Id.*)

After holding multiple hearings, the trial court denied Stephen's motion to suppress:

The Court having heard the testimony and reviewed the applicable case law finds that there are insufficient grounds to suppress the entire truck and its contents including the "black box" which stores information including crash data.

. . .

The parties agree that items including a GPS unit were removed from the truck at some time after the pictures taken at the scene by [Florida Highway Patrol ("FPH")]. The defense argues that the removal of these items constitutes tampering and demonstrates an imperfect chain of custody. Because the chain of custody cannot be established and the removal of the items demonstrates tampering, the entire truck and its contents should be suppressed/excluded from evidence. The defense does concede that the removal of the items does not in any way alter the crash damage to the vehicle and the data stored in the black box.

"Generally, relevant physical evidence can be admitted unless there is evidence of probable tampering.["] *Taylor v. State*, 855 So. 2d 1, 25 (Fla. 2003). Once the objecting party produces evidence of probable tampering, the burden shifts to the proponent of the evidence "to establish a proper chain of custody or submit other evidence that tampering did not occur." *Id.* (quoting *Taplis v. State*, 703 So. 2d 453, 454 (Fla. 1997); *Murray v. State*, 3 So. 3d 1108, 1115-16 (Fla. 2009)). The defense argues that because items were removed from the truck there was tampering; and since the state is unable to meet their burden to establish that there was no tampering, the entire truck should be suppressed or excluded. This is despite the fact that the state seeks only to introduce evidence of the crash damage to the truck and the information contained in the data recorder also known as the black box. The defense position is that it does not matter that the relevant portions of the truck sought to be introduced are in no way compromised by the removal of the GPS or the other items from the cab because once any degree of tampering is established the item is inadmissible.

. . .

Was there tampering with the evidence? Merriam-Webster's Dictionary of Law defines tamper as "to alter or interfere in an unauthorized or improper manner—used with [] tampered with evidence." The American Heritage Dictionary of the English Language Fourth Edition defines tamper as "To interfere in a harmful manner." Merriam-Webster Online

Dictionary defines tamper as "to interfere so as to weaken or change for the worse."

To assure a complete development of the facts in the present case, this court found that under a very broad interpretation of tampering that there was some degree of tampering. As a result the state was required to present evidence as to either the chain of custody or why the removal of items did not constitute tampering. The undisputed testimony established that the evidence sought to be introduced by the state was not changed or altered in any way. The mere removal of items from the cab did not change or alter in any [] way the information in the black box or the crash damage to the truck. In *Beck v. State*, 405 So. 2d 1365, 1367 (Fla. 4th DCA 1981) in addressing the issue of admissibility of physical evidence the court stated:

> A body of law had developed on the subject when the physical evidence has been offered by the prosecution. Since *Stunson v. State*, 228 So. 2d 294 (Fla. 3d DCA 1969) *cert. denied* 237 So. 2d 179 (Fla. 1970), Florida courts have recognized the principles initially set forth in *United States v. S.B. Penick & Co.*, 136 F.2d 413 (2d Cir. 1943) and later recited in *Gallego v. United States*, 276 F.2d 914, 914 (9th Cir. 1960):

>> Before a physical object connected with the commission of a crime may properly be admitted in evidence there must be a showing that such object is in substantially the same condition as when the crime was committed. This determination is to be made by the trial judge. Factors to be considered in making this determination include the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it. If upon the consideration of such factors the trial judge is satisfied that i[n] reasonable probability the article has not been changed in important respects, he may permit its introduction in evidence. (Citations omitted.)

> *See also United States v. Gagnon*, 635 F.2d 766 (10th Cir. 1980); *United States v. Brown*, 482 F.2d 1226,

41

> 1228 (8th Cir. 1973). From what can be seen from the foregoing, custody is one factor the trial court must consider in satisfying itself that the physical evidence has not been changed in important aspects.

> There was no improper alteration, harmful interference, weakening or change for the worse of the items sought to be introduced. There is no change to the crash damage to the truck or the black box data recorder from the time it was seized as evidence by the FHP.

(Doc. 14-1, Ex. 13 (some citations omitted).)

Stephen has not shown that, in denying his motion to suppress, the state court unreasonably applied clearly established federal law or relied on an unreasonable factual determination. As an initial matter, Stephen does not cite—and this Court cannot locate—any Supreme Court precedent that would require exclusion of the truck's crash damage and data recorder in these circumstances. *See Alexander v. Madden*, No. 2:18-cv-08991, 2021 WL 6752205, at *4 (C.D. Cal. Oct. 27, 2021) (noting that the Supreme Court has never "held that the admission of evidence with gaps in the chain of custody can violate due process"), *adopted by* 2022 WL 303250 (C.D. Cal. Jan. 14, 2022). "Given the lack of holdings from th[e] [Supreme] Court regarding" this issue, "it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (quoting 28 U.S.C. § 2254(d)(1)); *see also Minton v. Sec'y, DOC*, 271 F. App'x 916, 917 (11th Cir. 2008) ("Because clearly established federal law only includes legal rules determined by the

Supreme Court, a state court's decision cannot be contrary to clearly established federal law if no Supreme Court case addresses the issue decided.").[8]

In effect, Stephen seeks to challenge a state-law evidentiary ruling. "[F]ederal courts will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014). "Indeed, in a habeas corpus action brought by a state prisoner, [the court's] authority is severely restricted in the review of state evidentiary rulings." *Id.* "Habeas relief is warranted only when the error so infused the trial with unfairness as to deny due process of law." *Id.*; *see also Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998) ("We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial."). "A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998).

Stephen has not cleared this "high bar." *Taylor*, 760 F.3d at 1296. As the state court explained, the prosecution sought to introduce only (1) the truck's crash damage and (2) information obtained from the data recorder. There was no evidence of tampering with those two pieces of evidence. Indeed, during one of the hearings on

---

[8] Notably, Stephen challenges the state court's ruling primarily on the ground that it conflicts with *Murray v. State*, a Florida Supreme Court decision. 838 So. 2d 1073 (Fla. 2002). Florida Supreme Court decisions cannot serve as clearly established law under AEDPA. *See Hill v. Humphrey*, 662 F.3d 1335, 1360 (11th Cir. 2011) ("AEDPA precludes a federal court from . . . granting federal habeas relief in the absence of 'clearly established' federal law, which the United States Supreme Court admonishes is *a holding of that Court*.").

the motion to suppress, Stephen's trial counsel conceded "that the car wasn't recrashed to change its structure." (Doc. 14-5, Ex. 53, p. 37.) Likewise, at the same hearing, trial counsel "stipulate[d]" to testimony from the State's expert that "the information in the black box" "had not been tampered with." (*Id.*, pp. 37-39.) There is no basis to conclude that the admission of the crash damage or information from the data recorder "affect[ed] the fundamental fairness of the trial." *Mills*, 161 F.3d at 1289; *cf. Taylor v. State*, 855 So. 2d 1, 25026 (Fla. 2003) (holding that trial court "did not abuse its discretion in admitting [defendant's] boxer shorts" despite allegation that "the bag in which they were kept had been tampered with or altered, as evidenced by a missing note and a loose staple on the seal of the bag").

In short, the state court's denial of Stephen's motion to suppress did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable factual determination. Thus, Stephen is not entitled to relief on Ground Six.

### G.   Ground Seven

Finally, Stephen contends that "he is entitled to relief based on the cumulative error[s] in this case." (Doc. 1, p. 43.) Specifically, he argues that "[a]ll of the errors committed in [his] case, considered either individually or together, resulted in [him] being denied a fair trial." (*Id.*)

Respondent contends that Stephen failed to exhaust this claim because he "did not cite any federal constitutional authority" when he raised cumulative error in state court. (Doc. 13, p. 39.) The Court need not resolve this issue, because even assuming

that Stephen exhausted his cumulative-error claim, it fails on the merits. "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Here, there are no individual errors to accumulate, so Stephen's cumulative-error claim necessarily fails. *See Otero v. Sec'y, Dep't of Corr.*, No. 8:19-cv-39-SDM-AEP, 2022 WL 4095069, at *8 (M.D. Fla. Sept. 7, 2022) ("Because ground one is procedurally barred from federal review and ground two lacks merit, Otero proves no error to accumulate to show cumulative prejudicial effect."). Thus, Stephen is not entitled to relief on Ground Seven.[9]

It is therefore **ORDERED** that Stephen's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Stephen and to **CLOSE** this case.

<u>**Certificate of Appealability**</u>
<u>**and Leave to Appeal *In Forma Pauperis* Denied**</u>

---

[9] Stephen seeks an evidentiary hearing on his claims. The Court concludes that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record."). Moreover, Stephen appears to contend that the state court erred in denying his ineffective-assistance claims without holding an evidentiary hearing. This argument is not cognizable on federal habeas review. *See Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief.").

It is further **ORDERED** that Stephen is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To obtain a COA, Stephen must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Stephen has not made the requisite showing. Finally, because Stephen is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on February 24, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE